Joseph HOPKINS, Plaintiff,

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, a body politic and corporate, et al., Defendants.**

No. 71 C 1450.

United States District Court,
N. D. Illinois, E. D.

Aug. 25, 1971.

Ligtenverg, DeJong & Leahy, Chicago, Ill., for plaintiff.

James Coffey, Board of Education, City of Chicago, Chicago, Ill., for defendants.

## OPINION

McMILLEN, District Judge.

Plaintiff, a certified but non-tenured teacher, seeks damages and injunctive relief under 42 U.S.C. § 1983 for an allegedly unconstitutional termination. The defendants include the Board of Education of the City of Chicago, the principal of the high school where plaintiff was teaching on and before May 21, 1971, and certain other officials of the Board of Education. The case was tried by this court on the merits, without any preliminary motions having been filed to test jurisdiction or justiciable issues.

It appears from the pleadings and the uncontested facts that plaintiff was employed as a day-to-day substitute at the Hyde Park High School in Chicago. On May 21, 1971 he was relieved of further duties and has not worked for the defendant since that time. Plaintiff alleges that his rights under the First Amendment of the Constitution of the United States were violated because the real reason for his termination was to interfere with his right of free speech and because the defendants had no other valid grounds for terminating him. He further alleges that the manner in which his termination was effected deprived him of his rights without due process under the Fourteenth Amendment of the Constitution. By a motion at the close of all the evidence, plaintiff also moved to add the charge that his rights under the Fourth Amendment of the Constitution were violated by an unreasonable search.

Defendants allege that plaintiff was terminated for failure to perform his duties as a teacher and failing to teach his classes on May 20 and May 21, 1971. They further allege that plaintiff was terminated after a full discussion with school authorities, in accordance with existing and long-standing procedures. Defendants admit that plaintiff has received no teaching assignments since his termination and concede that this termination has become a part of his personnel file. They make no representation whether plaintiff will or will not be engaged to teach for the Chicago Board of Education in the future, even though his teaching certificate remains in effect.

Many claims are made in the pleadings and in the evidence by both parties on matters collateral and antecedent to the foregoing issues, but the controlling question of fact on the First Amendment claim is whether the plaintiff was terminated because of a critical talk which he made at a public meeting of the Woodlawn Community Board on May 14, 1971. Although the high school principal was on leave for five weeks prior to May 20, it can be assumed that she was aware of plaintiff's criticism, since other school officials attended the meeting. Nevertheless, there is no evidence connecting this isolated incident to the termination and no evidence of any hostility on the part of the principal toward plaintiff. It would be a mere naked inference to conclude that his speech was the true reason for the termination, and there is no evidence of the plaintiff's exercise of his right of free speech on any other occasion. At various times on May 20 and 21 certain school officials accused him of distributing Communist literature and of inciting the students to boycott or riot, but plaintiff does not allege that these activities were interfered with, and in fact denies that he engaged in them. Plaintiff therefore completely failed to find any direct evidence of a connection between free speech and his termination.

The plaintiff contends, however, that an absence of any *bona fide* ground for his termination would support the in-

ference that his speech was the real reason. Although it is not the function of this court to review the propriety or wisdom of the defendants' exercise of discretion, it has become proper to determine whether the defendants acted in good faith or whether they were instead acting behind a smoke screen in retaliation for the speech. Simcox v. Board of Education of Lockport Township High School, 443 F.2d 40 (C.A.7, May 12, 1971).

The question of fact which governs the reasons for the termination is whether or not the plaintiff satisfactorily performed his assigned duties as a teacher on the mornings of May 20 and 21, 1971 at the Hyde Park High School. It appears from the evidence that an effective student boycott was in progress during those two days at the school. The confused situation resulting from the boycott was aggravated by a series of fire alarm bells on both days, causing students and faculty to spend considerable time vacating and re-occupying the school. It is therefore difficult to know, from the evidence, exactly where the plaintiff was or what he was doing at all times on the mornings in question.

It is clear, however, that he was not always conscientiously attempting to perform his duties, as can be concluded from his testimony and that of his other witnesses. Plaintiff testified that on the morning of Thursday, May 20, 1971, he was present at his first period class at 8:00 a. m. and left the building five minutes thereafter in response to a fire alarm. He stayed outside for one-half hour and played chess with a student, McKinley. Second period commenced at 8:40, and plaintiff says he returned to his room, #324, at about 8:45. Instead of waiting for students there, he went to the Mathematics Resource Center, Room 322, leaving a message on the blackboard for his students to come there. Another fire alarm allegedly sounded at 9:10 a. m., shortly before the end of the second period, and plaintiff says he left the building again for 30 or 40 minutes.

He re-entered at 9:50 a. m., which was the end of his third teaching period, whereupon he was accosted and questioned by school board representatives. At this point, a security officer of the defendant attempted unsuccessfully to search plaintiff's shopping bag. Plaintiff testified that he then went to his classroom, left his shopping bag there, went to the classroom of a fellow teacher to joke for about fifteen minutes about the searching incident, returned to his classroom until 10:30 a. m., which was the end of his fourth period, and then took his scheduled lunch period. During each of the four preceding periods, he was assigned to teach classes, but few if any students were in attendance.

Defendant's witnesses contradicted plaintiff's account of the length of the fire alarm periods and his whereabouts during the morning in question, and plaintiff's own witnesses gave versions differing somewhat from his in several respects. For example, his witness Lund testified that he himself returned to the school building at about 8:30 a. m. after the first fire alarm, stayed in his own classroom during 20 minutes of the second period (albeit without students) and conducted his third period class from 9:20 to 9:50 with two students but without fire alarms.

Plaintiff's witness Horn testified that during the first fire alarm, she saw plaintiff outside playing chess with a student. During the second period she was in Room 322 (the Mathematics Resource Center) with plaintiff and the student chess player until 9 a. m. During the fourth period she was in her own room #326 when plaintiff came in to tell her about the above "searching" incident for about fifteen minutes. Plaintiff's witness Parker testified that he saw plaintiff at the attendance office that morning about 9:50 a. m.

The student McKinley testified that he was with plaintiff outside the building from 8:10 to about 8:40 a. m. (without mentioning chess), that plaintiff then went to his classroom, #324, and put the

message on the blackboard, after which they went to the Mathematics Resource Center and played three dimensional tic-tac-toe until evacuated by another fire alarm. He testified that plaintiff re-entered the building at 9:30.

The school situation and plaintiff's reaction thereto were substantially the same on the morning of Friday, May 21, and his witnesses' accounts again varied from his in some of the details. This morning is distinguished by the fact that during the third period plaintiff voluntarily accompanied a fellow teacher, Wolf, who had been summoned to the principal's office. This teacher wanted someone to witness what she feared was going to be said by the principal. When the two teachers entered the office, the principal asked plaintiff if he was going to "follow the program" and teach and, if not, to sign out. Plaintiff responded that he would have to think about it and would decide later, or words to that effect. This response itself indicated that the plaintiff was not attending to his duties at all times on May 20 and 21, and defendant's witness Scrutchins, among others, had presumably reported to the principal to this effect. The principal therefore asked plaintiff to leave the school building and to "report downtown." He was in effect suspended, subject to the further consideration to be given the matter by higher authorities.

■ Plaintiff concedes that he had a duty to teach his classes, and there is also evidence that a memorandum had been circulated prior to the boycott, specifically instructing all teachers to attend class or leave. The foregoing summary of the plaintiff's evidence demonstrates that defendants had reason to believe that plaintiff did not follow this "program" on the mornings in question, fire alarms and student boycotts notwithstanding. Under *Simcox, supra,* plaintiff retained the affirmative burden to show an ulterior and unconstitutional motive. He failed to do so, by inference or otherwise.

Plaintiff next contends that his rights under the Fourteenth Amendment of the Constitution were violated in that he was entitled to a more specific statement of the reasons for his termination and to a more complete review before it became final. He does not contend that such a procedure is required by any Illinois statute or by any rule of the Board of Education or by any provision in the union contract. He relies on such cases as Roth v. Board of Regents, 446 F.2d 806 (C.A.7, #18,490 July 1, 1971), Sindermann v. Perry, 430 F.2d 939 (C.A.5, 1970), and Drown v. Portsmouth School District, 435 F.2d 1182 (C.A.1, 1970).

Plaintiff's first notice of suspension was given when he accompanied fellow teacher Wolf to the principal's office on the morning of May 21. At that time the principal told him that he was "not following the program" of either attending classes or leaving the building, and plaintiff said he would decide later if he would follow it. Shortly thereafter on the same morning, plaintiff met with the principal and at least two other school board officials and did not change his position. At that time he was also accused of distributing Communist literature and inciting the students to riot.

On May 27, plaintiff met downtown with the director of teacher personnel, Robinson, and other school board officials and was told that he had failed to perform his duties of teaching his assigned classes. When asked to state his position, plaintiff requested that his union representative be present. The next day, May 28, plaintiff and two of his union representatives met with Robinson and several other school officials, including the principal. The school representatives said that plaintiff had been terminated for failure to discharge his responsibilities as a teacher and failure to follow the orders of the principal as enunciated in the "program" aforesaid. Apparently no mention of the other accusations were made at the two meetings downtown. The union asked for a more definite written specification of the

charge and reasons for termination, but none was ever furnished. Plaintiff does not define what kind of a hearing should have been granted him but contends that the verbal notices and the two meetings were insufficient to constitute due process.

■ It is the opinion of this court that this plaintiff was accorded as much due process as the Fourteenth Amendment entitles him to within the meaning of Cafeteria and Restaurant Workers Union et al. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Albeit the procedure may have been somewhat peremptory, it must be remembered that plaintiff was a day-to-day substitute teacher without tenure. He was told specifically why he was being terminated, and there could have been little doubt in the plaintiff's mind as to what the stated reasons consisted of. Furthermore the principal's initial action was subsequently discussed with plaintiff and his union representatives by higher school board officials who had ample authority to overrule the principal's decision.

Plaintiff does not contend that this procedure was discriminatory or otherwise unlawful but merely that it did not go far enough. See Roth v. Board of Regents, D.C., 310 F.Supp. 972, aff'd, 446 F.2d 806 (C.A.7, 1971). If the *Roth* decision was intended to apply to all non-tenured teachers in all situations, then it is apparent that plaintiff was not accorded the type of administrative review specified by the trial court therein. However, the sense of the foregoing Court of Appeals decision seem to be that of affirming the trial court's exercise of discretion rather than attempting to lay down absolute rules for all situations. It is the opinion of this court that the procedure followed in the plaintiff's case was reasonably fair, that no fuller or further administrative review would have accomplished any worthwhile

objective or changed the result, and that the respective interests of the parties and of the public do not require more than was done. It should be added that plaintiff has now been accorded a full judicial review of the facts and of the procedure, although not as a concomitant of due process. Cf. Ferguson v. Thomas, 430 F.2d 852 (C.A.5, 1970).

■ Finally, plaintiff contends that the attempt of the security officer to pry into his shopping bag on May 20 was an unreasonable search under the Fourth Amendment of the Constitution. Without going into the finer aspects of the law of search and seizure as it applies to nontenured teachers in school buildings, suffice it to say that plaintiff's shopping bag was not searched, nor was the person who attempted to do so made a party defendant. But more to the point, there was no evidence that plaintiff's subsequent termination was due to his resistance to the attempted search or that the discharge in any way infringed his right to be free from an unreasonable search.

■ In conclusion, the court agrees that the plaintiff should not be terminated even as a nontenured teacher for reasons that are calculated to interfere with his constitutional rights of free speech or of freedom from unreasonable search. The court also agrees that, prior to termination, he should be advised of the reasons and be given a reasonable opportunity to present his side of the matter to the responsible authorities. But he is not entitled to relief under 42 U.S.C. § 1983 unless he can demonstrate that the reasons for his termination or the way in which it was consummated by the Board deprived him of some constitutional or statutory right. See Fluker v. Alabama State Board of Education, 441 F.2d 201 (C.A.5, 1971) and Hodgin v. Noland, 435 F.2d 859 (C.A.4, 1970). None of these prerequisites are satisfied by the record in this case, and the plaintiff must therefore go hence without day.